Filed 12/23/14  Jessica H. v. Super. Ct. CA5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| JESSICA H., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF STANISLAUS COUNTY, <br><br> Respondent; <br><br><br> STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, <br><br> Real Party in Interest. | F070238 <br><br><br> (Super. Ct. Nos. 516756, 516757 & 516969) <br><br><br> **O P I N I O N** |

**THE COURT**<sup>*</sup>

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Ann Q. Ameral, Judge.

Rebecca A. Roberson, for Petitioner.

No appearance for Respondent.

John P. Doering, County Counsel, and Maria Elena Ratliff, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

<sup>*</sup> Before Gomes, Acting P.J., Detjen, J., and Franson, J.

Jessica H. seeks extraordinary writ review of the juvenile court's orders terminating her reunification services and setting a Welfare and Institutions Code section 366.26 hearing[1] as to her three-year-old son Christian, one-year-old son Aaron and ten-month-old daughter N.H. Jessica contends the juvenile court erred in finding there was not a substantial probability the children could be returned to her custody. We deny the petition.

## PROCEDURAL AND FACTUAL SUMMARY

In August 2013, the Stanislaus Community Services Agency (agency) took then two-year-old Christian and seven-month-old Aaron into protective custody after receiving reports that they were living with their mother, Jessica, in squalid conditions and that Aaron appeared to be malnourished and weak. The agency believed, based on its long relationship with Jessica, that drug use, mental illness and domestic violence factored into her inability to properly care for the children. The agency also learned that Jessica left the children in the care of Aaron G., her husband and the children's father. Aaron G. (father) was a registered sex offender and prohibited from being around the children. Father was taken into custody and the children were placed in foster care.

The juvenile court ordered the children detained and the agency referred Jessica for services including a drug and alcohol assessment, domestic violence and individual counseling and parenting classes.

In late August 2013, Jessica completed the drug and alcohol assessment and was referred to Stanislaus Recovery Center for detoxification which she completed. Around this time, Jessica discovered she and father were expecting another child. She began attending group meetings while on a waiting list for outpatient treatment at First Step Perinatal Drug & Alcohol Treatment Program (First Step) and calling Redwood Family Center for admittance into their sober living facility.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

The agency advised the juvenile court that Jessica was willing to engage in services but became easily overwhelmed and was prone to anger and resistance when she was confused. Her social worker believed she would need services for a "considerable time" and emphasized Jessica's need to initiate services promptly. The agency did not recommend reunification services for father based on his sex offender status. (§ 361.5, subd. (b)(16).)

In October 2013, the juvenile court took jurisdiction over the children, ordered reunification services for Jessica but denied services for father. The court set the six-month review hearing for March 2014.

In December 2013, Jessica tested positive for methamphetamine and was admitted for residential treatment at Nirvana Drug & Alcohol Treatment Program (Nirvana). In late January 2014 while a resident of Nirvana, Jessica delivered N.H. by cesarean section (C-section). Jessica was unable to have N.H. with her at Nirvana and consented to having N.H. placed in protective custody.

In February 2014, the juvenile court ordered N.H. detained and the agency placed her with her brothers in foster care. That same month, the agency received a progress report that Jessica continued to test negative for drugs and was on track with her treatment plan. She was expected to complete her program in early March and transition to Redwood Family Center and First Step for day treatment. Her counselor also reported that father attempted to see Jessica at the hospital when N.H. was born but was turned away.

In mid-February 2014, N.H. was admitted to Valley Children's Hospital in Madera for pertussis and placed on life support. Jessica was allowed to leave Nirvana to stay at the Ronald McDonald House to be near her.

In its report for the six-month review hearing, the agency reported that Jessica had done very well in addressing her drug abuse and separating from father. She was testing negative for drugs, filed for divorce and had obtained a restraining order against him.

3

However, she had not completed the other components of her case plan because she was recovering from her C-section and attending to N.H. at the hospital. Given Jessica's progress with her drug abuse, the agency believed Jessica could complete her services if given additional time and recommended the juvenile court continue her services until the 12-month review hearing.

After the agency completed its report, social worker Diana Caradonna was informed by the program director at Nirvana that Jessica had been gone for four or five days. Jessica initially denied not being at the Ronald McDonald House and using methamphetamine. When pressed, she said she was "stuck in Modesto" for a few days and used methamphetamine.

In March 2014 the juvenile court conducted a dispositional hearing as to N.H. and a six-month review hearing as to Christian and Aaron. The juvenile court declared N.H. a dependent, removed her from parental custody and granted Jessica six months of reunification services. The juvenile court found that father's whereabouts were unknown and denied him reunification services. As to Christian and Aaron, the juvenile court found that Jessica's progress was "fair" and that there was a likelihood the boys could be returned to her by the 12-month review hearing which it set for September 2014.

Following the hearing, Caradonna arranged for Jessica to have another alcohol and drug assessment during which Jessica admitted to relapsing on methamphetamine. Jessica denied, however, using after being "caught." Caradonna believed Jessica was minimizing her relapse and trying to avoid going back to Nirvana. She arranged for Jessica to pick up her belongings at the Ronald McDonald House and return to Nirvana.

Approximately a week later, Caradonna was informed that Jessica left Nirvana after walking out of a meeting to discuss her relapse. The substance abuse specialist said Jessica was told she could either "get honest or pack her bags." Jessica chose to leave. The specialist said that Jessica did not appear to have achieved any recovery after all her time there and was heard laughing about her relapse in group session.

4

The next day, Caradonna tested Jessica and she tested negative for drugs. Caradonna required Jessica to attend a Narcotics/Alcoholics Anonymous (NA/AA) meeting daily for the next three weeks before she would refer her for drug treatment. Jessica succeeded in doing so; however, she was asked to drug test several times but did not, making various excuses. When asked if she was using drugs, she said she needed to get back into treatment. She said she did not use "a lot" and used alone.

In April 2014, N.H. was discharged from the hospital and placed with her brothers.

In early June 2014, Jessica was admitted to Nirvana for residential treatment. She tested positive for methamphetamine at the time of her admission. According to the staff, Jessica's attitude and demeanor had greatly improved and she was engaging in services. She also regularly visited the children once a week for two hours. She interacted appropriately with them and did her best to attend to all three children. However, on several occasions while visiting the children at the agency facilities, the staff noticed Jessica had difficulty caring for all three children at the same time.

In July 2014, Jessica successfully completed residential treatment at Nirvana and transitioned to Redwood Family Center and day treatment at Nirvana. However, the agency was concerned that she maintained contact with father. Consequently, Caradonna checked Jessica and father's Facebook pages. In two separate postings in August, father stated that he missed Jessica and the children and had fun with Jessica the day before. He said they were both excited. In the other post father stated that Jessica called him and wanted him to go with her to the hospital to see her "pops." Jessica adamantly denied having any contact with father. She said she went to see her grandfather in the hospital but father was not there. She believed he heard about her grandfather through her family's Facebook page.

In mid-August 2014, Caradonna received a progress report from Tracey McCullough, Nirvana's Program Director, stating that Jessica was attending group

5

sessions, working with her sponsor and testing negative for drugs. Jessica was tentatively scheduled to complete day treatment in early September 2014 and transition to First Step for outpatient services. McCullough noted that Jessica was complacent at times and appeared to be going through the motions.

By the end of September 2014, Jessica had been in treatment at First Step for approximately a month. According to the program director, she was compliant with the program standards, had an excellent attitude and tested negative for drugs. She also completed eight of the required eight parenting group sessions, was attentive to group topics, completed her assignments and was receptive to suggestions and feedback.

Jessica was also participating in domestic violence and individual counseling though Sierra Vista Child & Family Services. Jessica appeared motivated and open to counseling since she returned to services in July 2014. She was able to identify the characteristics of a batterer and how children are affected by domestic violence and discussed how she could make better life choices. Her counselor believed she could make further progress if she continued to attend counseling consistently and comply with the program requirements.

Jessica was also reportedly doing well at Redwood. According to the program director, she attended the required NA/AA meetings, met weekly with her sponsor, participated in drug treatment and tested negative for drugs. In addition, she was attentive to the children during their monitored visits, appropriately disciplined them and never left them unattended.

In October 2014, the juvenile court conducted a contested 6-month review hearing as to N.H. and 12-month review hearing as to Christian and Aaron. The agency's recommendation going into the hearing was to terminate Jessica's reunification services as to all three children because Jessica had not made sufficient progress toward meeting her case plan objectives and did not appear able to do so in the time remaining. The agency was particularly concerned about the possibility Jessica was going through the

6

motions of treatment given her failure to seek out support after she relapsed and her resistance to continue treatment. The agency was also concerned that Jessica had difficulty maintaining healthy boundaries in her personal relationships and at times struggled to manage all three children without assistance during visitation.

Jessica was the sole witness at the contested hearing. She testified that she was 24 years old and first used methamphetamine when she was 16. She last used the drug in June 2014, the day she entered Nirvana. Prior to that, she was using methamphetamine "pretty much on a daily basis." She was still receiving treatment at First Step, working on step three of the 12-step program and had a sponsor. She was participating in, but had not completed, parenting classes and individual and domestic violence counseling.

Jessica testified she last saw father in June 2014 before she went into treatment. She was at a park near her aunt's house and he approached her. She walked away from him and had not seen him since. She denied having any contact with him on Facebook.

At the conclusion of the hearing, the juvenile court found it would be detrimental to return the children to Jessica's custody. It also found that Jessica had not participated regularly and made substantive progress in her services plan and that there was not a substantial probability the children could be returned to her within the statutory timeframe. Consequently, the court terminated Jessica's reunification services as to all three children and set a section 366.26 hearing.

This petition ensued.

## DISCUSSION

Jessica contends the juvenile court erred in finding there was not a substantial probability the children could be returned to her custody by the 18-month review hearing. As framed, Jessica's contention presumes that the juvenile court had the option of continuing her reunification services to the 18-month review hearing as to all three children. Such is not the case, however, because the juvenile court's rulings arise from a combined 6- and 12-month review hearing and the governing statutes, section 366.21,

7

subdivisions (e) and (f) respectively, impose different timelines on reunification services. Thus, in order to address Jessica's contention, it is necessary to provide a brief overview of the dependency law related to the duration of reunification services and the juvenile court's considerations at the 6- and 12-month review hearings.

When the juvenile court determines, as it did here, that a child cannot be returned to parental custody, its decision whether to continue reunification services depends on the child's age at the time of the initial removal and the stage of the proceedings. (§ 361.5, subd. (a).) If the child was under the age of three years, reunification services are presumptively limited to six months from the date of the dispositional hearing but no longer than 12 months from the date the child entered foster care.[2] (§ 361.5, subd. (a)(1)(B); *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 843.) If the child was three years of age or older reunification services are presumptively limited to 12 months from the date the child entered foster care. (§ 361.5, subd. (a)(1)(A).) Notwithstanding these limitations, the juvenile court may continue reunification services at the 12-month review hearing for any child up to 18 months after the child was originally removed from parental custody. (§ 361.5, subd. (a)(3).)

Christian and Aaron were originally removed from Jessica's custody in August of 2013. Thus, all other considerations aside, the juvenile court could have continued services for Jessica as to them until February 2015 applying the 12-month review statutory limitation. The court's limitation as to N.H. was different because it had to apply the six-month review statute. Since N.H. entered foster care on March 13, 2014 (the date of N.H.'s jurisdictional hearing), Jessica's services as to her were presumptively limited to March 2015.

---

[2]    Under section 361.49, "a child shall be deemed to have entered foster care on the earlier of the date of the jurisdictional hearing … or the date that is 60 days after the date on which the child was initially removed from the physical custody of his or her parent .…"

The question then is whether the juvenile court erred in finding there was not a substantial probability the children could be returned to Jessica within the timeframes as set forth above.

The dependency statutes offer more leniency in the early stages with respect to continuing reunification services. The implications of the juvenile court's "substantial probability of return" finding reflects this shift. At the 6-month review hearing, the juvenile court must continue reunification services to the 12-month review hearing if it finds there is a substantial probability the child may be returned to parental custody. Even if the juvenile court finds there is not a substantial probability of return, the court may still continue services. (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 176. (*M.V.*).) Such is not the case at the 12-month review hearing. The juvenile court must terminate reunification services if it finds there is not a substantial probability of return. (§ 366.21, subd. (g)(1).)

In order to find a substantial probability of return at the 12-month review hearing, the juvenile court must find pursuant to section 366.21, subdivision (g)(1) all of the following: (1) the parent consistently and regularly contacted and visited the child; (2) the parent made significant progress in resolving the problems that led to the child's removal; and (3) the parent demonstrated the capacity and ability to complete the objectives of his or her treatment plan and provide for the child's needs. (§ 366.21, subd. (g)(1).) At the six-month review hearing, the court is not limited to these three factors (subdivision (g) factors) and may consider all of the evidence. (*M.V.*, *supra*, 167 Cal.App.4th at p. 181.)

We review the juvenile court's finding there is not a substantial probability of return for substantial evidence. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688-689.) Whether the juvenile court made the correct decision upon its findings of fact is reviewed under the abuse of discretion standard. (*In re Brequia Y.* (1997) 57 Cal.App.4th 1060, 1068.)

With those principles in mind, we turn to Jessica's contentions. Jessica contends the only evidence she was not likely to reunify with the children was that she had only been engaged in services for approximately four months. If given until February 2015, she further contends, she could have completed her programs and demonstrated another seven to eight months of sobriety. She points out that she regularly visited the children and made significant progress in her court-ordered services plan "even if for only the past four months." She argues the juvenile court should have considered the hardships she faced early in the reunification period (i.e. N.H.'s birth and critical illness) in assessing her progress, as well as the fact that she was in a residential substance abuse treatment program.

We conclude substantial evidence supports the juvenile court's finding there was not a substantial likelihood the children could be returned to Jessica in the time remaining. As to the subdivision (g) factors, no one disputes that Jessica visited and maintained contact with the children. The evidence does not, however, support a finding she made significant progress in treating her methamphetamine abuse. She had over 12 months to achieve some level of recovery. Instead, she was in and out of drug treatment programs and continuing to use methamphetamine. It was not until June 2014, nine months into the reunification period, that she settled into treatment.

At the combined hearing, the juvenile court told Jessica that it would have continued services for her had she demonstrated such progress sooner. However, the court stated it could not find a substantial probability the children could be returned to her and the evidence supports that unlikelihood. Jessica has a long history of methamphetamine abuse and a high relapse potential. She also demonstrated a resistance to treatment multiple times during this reunification period.

As to Jessica's contention the juvenile court should have considered how N.H.'s birth and illness impacted her ability to participate in services, the record is silent as to whether or how the court viewed that evidence. Having reviewed the record, however,

10

we can say that the juvenile court was very sympathetic to Jessica. We can presume that it considered how N.H.'s illness impeded Jessica's progress. However, we must note that N.H.'s condition had resolved in April 2014, at least to the point where N.H. could be discharged from the hospital, and yet Jessica continued to use methamphetamine. Therefore, Jessica cannot attribute all of her delay in pursuing treatment to N.H.'s illness.

Finally, Jessica's contention the juvenile court should have considered her status as a resident of a substance abuse treatment program is misplaced. Section 361.5, subdivision (a)(3) requires the court to consider the special circumstances of a parent court ordered to a substance abuse treatment program in deciding whether to continue reunification services. These parents are to be given special consideration to the extent that their residential status limits or bars access to services and ability to maintain contact with the child. (§ 361.5, subd. (a)(3).) Jessica was not in residential treatment when the juvenile court decided not to extend her services. In addition, there is no evidence that Jessica at any time was limited or barred from accessing services or contacting her children.

In light of the foregoing, we conclude substantial evidence supports the juvenile court's finding there was not a substantial probability the children could be returned to Jessica's custody within the statutory time remaining. We further conclude the juvenile court did not abuse its discretion in not continuing reunification services for Jessica as to N.H. Finally, we conclude substantial evidence supports the juvenile court's orders terminating Jessica's reunification services as to Christian, Aaron and N.H. and setting a section 366.26 hearing.

Notwithstanding our opinion, nothing precludes Jessica from petitioning the juvenile court pursuant to section 388 to modify its order terminating her reunification services should circumstances change such that it would be in the children's best interest to do so.

11

## DISPOSITION

The petition for extraordinary writ is denied.  This opinion is final forthwith as to this court.